FILED
IN CLERKS OFFICE
U.S. DISTRICT COU~~~~  ~ N.Y;
AUG 2 7 2003
P.M.
TIME A.M. _____

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------X

Michael Spinner *et alia*,

                      Plaintiffs,

     - against -

City of New York *et alia*,

                      Defendants.

-----------------------------------------X

CV-01-2715 (CPS)

MEMORANDUM
AND ORDER

SIFTON, Senior Judge.

       Plaintiffs bring this action pursuant to 42 U.S.C.
§ 1983 and the Fourth and Fourteenth Amendments to the United
States Constitution against defendant City of New York, asserting
that defendant's unwritten policy of strip searching detainees,
at the processing and holding facility known as Brooklyn Central
Booking ("BCB") is unconstitutional.  Currently before this Court
is defendant's objection to the January 28, 2003 order ("January
28th Order") of Magistrate Judge Pollak that denied defendants
motion to disqualify plaintiffs' counsel Richard Cardinale
("Cardinale") and Michael Hueston ("Hueston") (collectively,
"plaintiffs' counsel").

BACKGROUND

       The following facts are drawn from the submissions of
the parties and are undisputed unless otherwise noted.  I recite
only those facts necessary to decide the present motion.

Plaintiffs' counsel were formerly employed by defendant as Assistant Corporation Counsels ("ACC"'s) in the Special Federal Litigation Division ("SFLD") of the New York City Law Department.  The SFLD represents defendant and its officials in civil rights cases brought in federal court involving allegations of police, District Attorney, or correction officer misconduct. Between June 1999 and until the case was settled on February 9, 2001, Hueston represented defendant in *Kellner v. City of New York*, an individual action brought by a felony arrestee who alleged that he was unconstitutionally strip searched at Manhattan Central Booking by DOC officers on January 3, 1997, in accordance with a written Department of Corrections ("DOC") policy.  During the time that *Kellner* was pending, Norma Kerlin ("Kerlin") an ACC in the SFLD also was representing defendant in *Tyson v. City of New York*, a class action brought on behalf of all persons who had been or would be arrested for misdemeanor or non-criminal offenses in New York and Queens Counties and then were or would be strip searched pursuant to City, DOC, and New York City Police Department ("NYPD") policy, practice, or custom. Hueston did not represent defendant or participate substantially in *Tyson*.

On May 2, 2001, plaintiffs filed a complaint in this Court challenging the constitutionality of the NYPD's unwritten policy of strip searching misdemeanor arrestees at BCB.  The case was subsequently referred to Magistrate Judge Pollak for pretrial preparation.

- 3 -

On February 8, 2002, defendants moved to disqualify
plaintiffs' counsel because of a conflict of interest stemming
from Hueston's alleged exposure to privileged and confidential
information regarding strip-search practices while employed by
the SFLD.[1]  Specifically, defendant alleged that Hueston had
obtained confidential and privileged information gathered in
preparation for its defense in *Tyson* because Hueston initially
believed that plaintiff in *Kellner* was an "opt-out" member of the
*Tyson* class.  Hueston, through an unsworn declaration, initially
denied these allegations and maintained that he never spoke to
any DOC or NYPD officials regarding the strip-search policy for
misdemeanor arrestees because such policies were irrelevant to
his defense in *Kellner*[2], that he never received any privileged
materials or information relating to strip searches, and that he
never spoke to Kerlin regarding either *Tyson* or *Kellner*.  Based
on Hueston's declaration and defendant's failure to present any
evidence beyond its conjecture that Hueston was probably exposed
to privileged and confidential materials related to *Tyson*,
Magistrate Judge Pollak denied defendant's motion for
disqualification in an order dated May 20, 2002 ("May 20th
Order").

----

[1]    Defendants concede that Cardinale did not personally or substantially
participate in either the Manhattan or Queens strip-search cases and, thus, seek
to disqualify Cardinale on the basis of his partnership with Hueston.

[2]    It is undisputed that strip searches of persons charged with felony
offenses are governed by different considerations than those that govern strip
searches following a misdemeanor arrest.

- 4 -

Thereafter, in a subsequent notice of motion dated June 10, 2002, defendants filed objections to the May 20th Order with this Court.  On June 28, 2002, while these motions were pending before this Court, defendants, following a telephone conference with Magistrate Judge Pollak, agreed to withdraw their objections and sought reconsideration by Magistrate Judge Pollak pursuant to Rule 60(b) of the Federal Rules of Civil Procedure of the May 20th Order in light of "newly discovered evidence."

Defendant's newly discovered evidence consisted of the *Kellner* case file, which had been misplaced following the events of September 11, 2001, after which the SFLD was abruptly relocated from its offices at 100 Church Street.  Defendants alleged that the contents of the case file contradicted some of the assertions that Hueston had made in his unsworn declarations.[3]

First, defendant alleged that contrary to Hueston's unsworn assertions, he had in fact litigated *Kellner* as a *Tyson* opt-out case from June 1999 to February 2000.  To support this allegation defendant offered two settlement abstracts prepared by Hueston on January 20 and February 3, 2000.[4]  In the January 20th abstract, Hueston states that "plaintiff's name is not a Tyson class member ... [and that h]e has opted out of the class."

---

[3]    Defendant has provided Magistrate Judge Pollak and this Court with unredacted copies of the *Kellner* case file for *in camera* review.

[4]    The February 3rd abstract suggests that by this date Hueston knew that Kellner was not an opt-out member of the *Tyson* class.  In it he writes that the case should be settled for the "nuisance value" or $17,500 because "plaintiff was strip-searched while still charged with a felony, which is lawful."

- 5 -

Hueston further states that, "[a]ccording to DOC arrest records, there is nothing to suggest that DOC would have a basis to conduct a strip search [on plaintiff]."  Hueston also surmised that a claim that plaintiff was not stripped searched would likely be unsuccessful at trial because "it runs contrary to our concession in *Tyson*, and it seems to me that we would want to maintain consistent positions."

Second, defendant challenged Hueston's assertion that he never spoke to Kerlin about that case or *Kellner*.  To establish this claim defendant offered e-mails exchanged between Kerlin and Hueston wherein Hueston asked to discuss *Kellner* further by telephone and inquired into settlement figures for *Tyson* claimants.  Defendant also pointed to the above-mentioned settlement abstracts in which Hueston indicated that he had spoken to Kerlin regarding an appropriated settlement in *Kellner*, as well as supervisors' notes on memoranda assigning *Kellner* to Hueston, directing him to talk to Kerlin and to attend a meeting she led concerning strip-search cases.[5/]

Third, defendant attempted to discredit Hueston's statement that the only documents he had requested during his involvement with *Kellner* were those pertaining to Kellner's arrest.  Defendant offered formatted requests for materials

---

[5/]   Hueston does not now dispute that he attended such a meeting, but he maintains that the meeting was "like every Law Department meeting in that it involved a discussion of substantive law" and that "at no point during the meeting were confidential attorney-client communications discussed."  Defendant does not argue that any attorney-client communications were discussed at this meeting.

- 6 -

addressed to the paralegal unit of the SFLD, which were signed by Hueston and detailed his requests for prisoner rosters, command logs, central booking logs, patrol guide provisions, and a copy and all drafts of DOC Institutional Order DD 11.16.0, a directive drafted by Manhattan Central Booking warden Alonzo Davis ("Davis").[6]  Defendant alleged that these documents further indicated that Hueston had treated *Kellner* as a *Tyson* opt-out case.

Fourth, defendant offered documents from the *Kellner* file indicating that Hueston had scheduled a "follow-up" appointment with Davis on a date between October 4 and October 8, 1999, and that Hueston had met with an unnamed client on October 7, 1999.  Defendant also offered a declaration by Davis stating that he had visited the Law Department in or about the fall or spring of 1999 and that he had met with a "male black attorney" whose name he could not recall.  Defendant alleged that these documents contradicted Hueston's claim that his only contact with Davis had been a "fifteen second" phone conversation.  Defendant also pointed to documents reflecting that on February 2, 2002, Hueston met with both Police Officers Bellomo and Colluso, the arresting officers in *Kellner*; this contradicted Hueston's previous claim that he had only met with Bellomo.

Fifth, defendant attempted to contradict Hueston's statement that he had never represented New York City Police Commissioner Howard Safir, by offering a letter written by

---

[6]    This document was at the center of the *Tyson* litigation.

Hueston to the Honorable Kimba Wood in which Hueston stated that he represented both the City of New York and Commissioner Safir in *Kellner*.  Other documents showed that Hueston had been assigned *Kellner* on June 8, 1999, and that Safir had not been eliminated as a defendant in the case until July 8, 1999.

Finally, defendant alleged that Hueston had misrepresented the extent of his involvement in the settlement of *Kellner*.  Defendant offered a letter written by Stephen Weiner ("Weiner"), plaintiff's counsel in *Kellner*, and addressed to Hueston regarding settlement of that case; Weiner's telephone records showing that Weiner called Hueston on December 13, 1999; and a letter from Weiner to Muriel Goode Trufante, an SFLD employee, expressing his appreciation for her processing settlement papers to permit payment of $10,000 to Kellner. Defendant alleged that these documents belied Hueston's claim that his involvement in the settlement negotiations did not extend beyond offering a $3,001 offer of judgment.

In response to this newly discovered evidence, Magistrate Judge Pollak placed Hueston under oath on September 6 and 20, 2002.  On both these occasions Hueston was cross-examined by defense counsel.  While under oath Hueston admitted that certain of his statements had been inaccurate and that his recollection has been refreshed by the newly discovered *Kellner* file.  In particular he stated that his recollections of settlement discussions was "faulty"; that he could not be certain that he had only interviewed Police Officer Bellomo on February

2, 2002; that he had in fact exchanged e-mails with Kerlin but that he had received no substantive or confidential information from her; and that between June and December 1999 or January 2000, while he was waiting for information in response to discovery requests, there was a certain period of time where he may have believed that *Kellner* was a *Tyson* opt-out case.

In the January 28th Order, Magistrate Judge Pollak credited Hueston's representations to the Court in their entirety based on her observation of his testimony and demeanor on direct and cross-examination. While the court noted that the newly discovered evidence contradicted some of Hueston's previous statements, it held that Hueston's representations were not deliberately misleading and that the newly discovered evidence was not legally sufficient to warrant disqualification in this instance.

On February 13, 2003, pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(a) of the Federal Rules of Civil Procedure, defendant filed objections to the January 28th Order with this Court. On February 18, 2003, plaintiff's counsel filed papers opposing that motion.

- 9 -

## DISCUSSION

Under 28 U.S.C. § 636(b)(1) and Rule 72(a)[7/] of the
Federal Rules of Civil Procedure, a district court may overturn a
magistrate's order on a non-dispositive matter when such order is
"found to be clearly erroneous or contrary to law." *See also
European Community v. RJR Nabisco*, 134 F. Supp. 2d 297, 302 n.5
(E.D.N.Y. 2001); *Weeks Stevedoring Co., Inc. v. Raymond Intern.
Builders, Inc.*, 174 F.R.D. 301, 303 (S.D.N.Y. 1997).  Dispositive
rulings, however, are reviewed by the district court *de novo*.[8/]
*See* Fed. R. Civ. P. 72(b) (referring to dispositive motions as
those "dispositive of a claim or defense of a party").  Motions
for disqualification of counsel are non-dispositive and are thus
subject to the more deferential clear-error standard of Rule

---

[7/]    Federal Rule of Civil Procedure 72(a), which is designed to implement
the legislative mandate of § 636(b)(1), and states in pertinent part:

> A magistrate judge to whom a pretrial matter not dispositive of a
> claim or defense of a party is referred to hear and determine shall
> promptly conduct such proceedings as are required and when
> appropriate enter into the record a written order setting forth the
> disposition of the matter...the district judge to whom the case is
> assigned shall consider such objections and shall modify or set
> aside any portion of the magistrate judge's order found to be
> clearly erroneous or contrary to law.

Fed. R. Civ. P. 72(a); *see* Charles Alan Wright, Arthur R. Miller & Richard L.
Marcus, 12 Federal Practice and Procedure § 3608 (2d ed. 1997).

[8/]    In its memorandum in support of the objections, counsel for defendant,
citing § 636(b)(1), urges this Court to make a *de novo* review of those portions
of the order to which objections are made.  However, § 636(b)(1) only authorizes
*de novo* review with respect to reports, specified proposed findings or
recommendations to which objection is made and not to orders.  *See European
Community*, 134 F. Supp. 2d at 302 (holding that Rule 72 is not applicable to
reports and recommendations of magistrate and that such matters are reviewed *de
novo*); *see also Delco Wire & Cable, Inc. v. Weinberger*, 109 F.R.D. 680, 685 (E.D.
Pa. 1986); 12 Charles Alan Wright, Arthur R. Miller, Richard L. Marcus, *Federal
Practice and Procedure* § 3069, at 355-56 (2d ed. 1997).

72(a).  *See European Community*, 134 F. Supp. 2d at 302 n.5;
*Weeks*, 174 F.R.D. at 303.  "[A] finding is 'clearly erroneous'
when although there is evidence to support it, the reviewing
court on the entire evidence is left with the definite and firm
conviction that a mistake has been committed."  *United States v.*
*United States Gypsum*, 333 U.S. 364, 395 (1948).  It well settled
that, when reviewing objections to disqualification motions under
§ 636(b)(1) and/or Rule 72(a), the clear error standard dictates
that the magistrate's decision be afforded broad deference; thus,
this Court is not warranted to simply substitute its judgment for
that of a magistrate judge.  *See Gucci America, Inc. v. Exclusive*
*Imports Int'l*, 2001 WL 21253 at *1 (S.D.N.Y. 2001); *Weeks*, 174
F.R.D. at 303; *Com-Tech Assocs. v. Computer Assocs. Int'l, Inc.*,
753 F. Supp. 1078, 1099 (E.D.N.Y. 1991), *aff'd,* 938 F.2d 1574 (2d
Cir. 1991).  Under this standard, a heavy burden on the moving
party is imposed.  *See Mitchell v. Century 21 Rustic Realty*, 233
F. Supp. 2d 418, 430 (E.D.N.Y. 2002); *McGrath v. Nassau County*
*Health Care Corp.*, 204 F.R.D. 240, 243 (E.D.N.Y. 2001); *Mathias*
*v. Jacobs*, 167 F. Supp. 2d 606, 621-23 (S.D.N.Y. 2001).

Here, the City objects to the January 28th Order on the
three grounds:  (1) the Court's interpretation of Disciplinary
Rule 9-101(b) of the American Bar Association Code of
Professional Responsibility was overly broad; (2) the Court's
findings that *Tyson*, *Kellner* and the present case do not
represent the same matter and that Hueston did not personally and
substantially participate in these matters are clearly erroneous;
and (3) the Court applied the wrong legal standard because it

required conclusive proof that Hueston had received privileged and confidential information.

### Interpretation of Disciplinary Rule 9-101(b)

The Second Circuit has cautioned that motions to disqualify are not to be granted indiscriminately because they interfere with a party's right to freely choose counsel and may be interposed solely for tactical reasons. *See Mitchell v. Metro. Life Ins. Co.*, 2002 WL 441194, at *3 (S.D.N.Y. 2002) (citing *Board of Educ. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979); *Government of India v. Cook Indus.*, 569 F.2d 737, 739 (2d Cir. 1978)). In fact, Courts have noted that motions to disqualify are "generally viewed with disfavor in this Circuit." *See Witorsch v. Notaris*, 1997 WL 529016, at *3 (S.D.N.Y. 1997) (quoting *Marshall v. State of New York Div. of State Police*, 952 F. Supp. 103, 106 (N.D.N.Y. 1997)); *see also Huntington v. Great Western Resources, Inc.*, 655 F. Supp. 565, 571 (S.D.N.Y. 1987) (noting that in disqualification decisions the Second Circuit has directed district courts to take a "restrained approach that focuses primarily on preserving the integrity of the trial process") (citations omitted). Thus, the moving party must meet a high standard of proof before a lawyer is disqualified. *See Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir. 1983); *Gov't of India*, 569 F.2d at 739; *Bennett Silvershein Assocs. v. Furman*, 776 F. Supp. 800, 802 (S.D.N.Y. 1991). Any doubts, however, should be resolved in favor of disqualification. *Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975).

- 12 -

In considering a motion for disqualification, courts in this Circuit traditionally refer to the American Bar Association Code of Professional Responsibility (the "Code"), which defines the ethical guidelines for members of the bar. *See Cheng v. GAF Corp.*, 631 F.2d 1052, 1054 (2d Cir. 1980); *Mitchell*, 2002 WL 441194, at *3; *Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. (UAW) v. Nat'l Caucus of Labor Comm.*, 466 F. Supp. 564, 566 (S.D.N.Y. 1979). Canon 9 of the Code provides that "[a] lawyer should avoid even the appearance of impropriety. Disciplinary Rule 9-101(B) and Ethical Consider- ation 9-3 address the appearance of impropriety insofar as it relates to former government employees. *See Int'l Union*, 466 F. Supp. at 566. Disciplinary Rule 9-101(B) provides that: "a lawyer shall not accept private employment in a matter in which he had substantial responsibility while he was a public employee." Similarly Ethical Consideration 9-3 states that "[a]fter a lawyer leaves judicial office or other public employment he should not accept employment in connection with any matter in which he had a substantial responsibility prior to his leaving, since to accept employment would give the appearance of impropriety even if none exists." Thus, under the disciplinary rules as applied in this Circuit, former government attorneys have been found to have engaged in improper conduct if they represent a party (1) adverse to a former client, (2) in a matter that is substantially related to their prior representation of the movant, and (3) in which they participated personally and

substantially while in government service.  *See Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir. 1983); *Int'l Union*, 466 F. Supp. at 569; *Ab v. Kaymr, Inc.*, 1991 WL 246465, at *4 (N.D.N.Y. 1991); *United States Football League v. National Football League*, 605 F. Supp. 1448, 1452 (S.D.N.Y. 1985).

In *International Union*, 466 F. Supp. 564 (S.D.N.Y. 1979)(citations omitted), after an extensive survey of Second Circuit precedent, the court adopted the language of the American Bar Association's Committee on Professional Ethics and defined a matter as "a discrete and isolatable transaction or set of transactions between identifiable parties," which involves a "particular situation and specific parties."  *Id.* at 558. Following *International Union*, it has become well established in the Second Circuit that disqualification of a lawyer or law firm on the basis of prior representation of an adverse party requires a showing of a "substantial relationship" between the subject matter of the prior representation and the issues in the present litigation.  *See Evans*, 715 F.2d at 791; *Red Ball Interior Demolition Corp. v. Palmadessa*, 908 F. Supp. 1226, 1239 (S.D.N.Y. 1995).  In determining whether a matter is substantially related to one which was previously litigated by counsel, the Second Circuit has held that the most important consideration is "not whether the two actions rely for their foundation upon the same section of law, but whether the facts necessary to support the two claims are sufficiently similar."  *General Motors Corp. v. City of New York*, 501. F.2d 639, 651 n.22 (2d Cir. 1974)

- 14 -

(upholding disqualification of attorney who had previously represented the United States in an antitrust suit alleging the monopolization or attempted monopolization of the nationwide market for the sale of buses from representing the City of New York in an antitrust action where "virtually every overt act of attempted monopolization alleged in the City's complaint is lifted in *haec verba* from the Justice Department complaint"),*see also Gov't of India*, 569 F.2d at 739-740 (holding that allegations of fraud were substantially related because both were premised on the allegedly fraudulent loading procedures of defendant, which was "[t]he very same information" necessary to a determination of the claim in the instant case).  This rule has it basis in policy considerations noted in *United States v. Escobar*, 910 F. Supp. 92, 97 (E.D.N.Y. 1995), namely, that a court must preserve the delicate balance between the need to encourage attorneys to practice in the service of the government and to specialize in particular fields of law on the one hand and the government's right to safeguard confidential information and the need to discourage government attorneys from handling government matters with an eye toward their own future private employment on the other.  In interpreting these precedents and policy considerations district courts have, in general, only granted disqualification motions where the facts giving rise to an issue that is material in both the former and present litigations are the same and must necessarily be considered in order to reach a decision in the present litigation.  *See*

- 15 -

*Mitchell*, 2002 WL 441194, at *4 (citing *United States Football League*, 605 F. Supp. at 1459); *Regal Marketing Inc. v. Sonny & Sons Produce Corp.*, 2002 WL 1788026, at *7 (S.D.N.Y. 2002) (same); *Chichinlnisky v. Trustees of Columbia Univ.*, 1993 WL 403972, at *3 (S.D.N.Y. 1993) (same); *Kamyr*, 1991 WL 246465, at *4 (same).

In the present case, Magistrate Judge Pollak applied the substantial relation test and determined that strip searches conducted by NYPD officers at the BCB were not substantially related to the Manhattan and Queens strip-search cases because these litigations concern different City agencies — the DOC (past litigation) and the NYPD (present litigation) — that are independent of each other and different policies — a written DOC directive an unwritten NYPD directive. *See Spinner v. The City of New York*, No. CV-01-2715, slip op. at 18 (E.D.N.Y. 2003) (hereinafter "Pollak Op."). Thus, because the factual circumstances that gave rise to the constitutional claims were different, Magistrate Judge Pollak found that the material facts giving rise to the Manhattan and Queens litigations would not be necessary in order for plaintiffs to establish their claims in the present litigation. Accordingly, Magistrate Judge Pollak denied the motion to disqualify.

In its present motion, defendant does not dispute that the facts giving rise to the present claims and those forming the basis of the prior litigation are different. However, defendant contends that Magistrate Judge Pollak's order was clearly

erroneous because it ignored the fact that the same legal issue,
the violation of the Fourth Amendment rights of misdemeanor
arrestees with the knowledge and acquiescence of high ranking
City officials, was the basis for claims in both the past and
present litigation; that many of the parties named in *Tyson* and
*Kellner* are named in the present case; and that Magistrate Judge
Pollak, in denying the motion to disqualify, relied heavily on
the plaintiffs' decision to base their complaint on a different
sub-theory of liability than was at issue in the Manhattan and
Queens litigations.  Based on these assertions, defendant argues
that both the facts and issues required to prove a constitutional
violation both in the past and present cases are substantially
related.  (*See* Def.'s Mem. in Supp. at 9.)

Defendant's argument ignores the well settled principle
discussed above that "it is the congruence of factual matters,
rather than areas of law which establishes a substantial
relationship for disqualification purposes." *See United States
Football League*, 605 F. Supp. at 1460 n.26 (citing *Emle Indus.,
Inc. v. Patentex, Inc.* 478 F.2d 562, 571-72 (2d Cir. 1973)).
These precedents assume that named parties were represented by
the same counsel and instead direct a court considering a motion
to disqualify to examine whether or not facts material to the
prior litigation will be necessary to render a decision in the
present litigation. *See id.* By conceding that the material
facts and circumstances necessary to a determination in the
present litigation are different from those germane to the prior

- 17 -

litigation and instead relying on the overlap of issues and
parties in the present litigation, defendant essentially concedes
that its argument lacks merit.

In fact, far from supporting its present position, the
cases relied on by defendant adhere to the general principle that
disqualification motions should not be granted absent factual
congruence.  In one case cited favorably by defendant, *United
States v. Uzzi*, 549 F. Supp. 979, 982 (S.D.N.Y. 1982), the court
held that an investigation conducted by the United States
Attorney was substantially related to a subsequent prosecution
based on this investigation because "the prosecution arose
directly out of that investigation."[9]  In contrast, here it is
undisputed that the facts and circumstances giving rise to the
present action while similar are clearly not congruent to those
material to *Tyson* and *Kellner*.

Because Magistrate Judge Pollak applied the proper
legal standard to determine whether the present litigation was
substantially related to the Manhattan and Queens litigation and
because it is undisputed that the present litigation concerns
different city agencies, personnel, and policies than the prior
litigation, this Court cannot state with a definite and firm
conviction that a mistake has been committed.  Accordingly,
Magistrate Judge Pollak's decision that the two matters are not

---

[9]    Defendant also relies on *LaSalle National Bank v. County of Lake*, 703
F.2d 252, 254 (7th Cir. 1983), where the court upheld disqualification based on
the undisputed fact that an attorney had access to specific sewer agreements that
would be relevant in the pending litigation.

substantially related within the meaning of Disciplinary Rule 9-101(B) is affirmed.

### Hueston's Testimony

Defendant next challenges Magistrate Judge Pollak's findings that (1) the strip-search litigations are not the same matter, and (2) Hueston did not personally and substantially participate in the Manhattan and Queens strip-search litigations, arguing that they are clearly erroneous because they are based in part on Hueston's contradictory statements.

While defendant claims that Magistrate Judge Pollak based her finding that the Manhattan and Queens litigations do not represent the same matter as the present litigation on Hueston's testimony, an analysis of the January 28th Order reveals that she relied on the allegations in the complaint in making this determination.  (*See* Pollak Op. at 18-19.)  Defendant claims that Magistrate Judge Pollak made this determination based upon Hueston's subsequently contradicted statements that he did not represent Kerik, treat *Kellner* as a *Tyson* opt-out case, correspond with Kerlin regarding *Tyson* and the possibility that *Kellner* might represent a *Tyson* opt-out case, or meet with Police Officers Cosaluzzo and Bellomo or Warden Alonzo Davis.  With the exception of the Davis and Bellomo meetings, Hueston does not dispute the validity of defendant's assertions.  Nevertheless, despite Hueston's misstatements, it is apparent that Magistrate Judge Pollak based her decision on the lack of factual congruence between the material facts giving rise to the present litigation

and those giving rise to the prior litigation.   In the January

28th Order, Magistrate Judge Pollak explicitly stated:

> "Nothing in the information presently presented to the Court
> alters the fact that Mr. Hueston did not represent the City
> in the *Tyson* class action litigation.   Even if the *Kellner*
> case had been a *Tyson* opt-out and had raised the same issues
> as *Tyson*, that does not change the fact that both cases are
> very different from the ones currently pending before this
> Court.   Different City agencies and personnel were
> responsible for the strip search policy being challenged in
> Queens and Manhattan and now under challenge in Brooklyn.
> The DOC, which ran the Queens and Manhattan facilities,
> played no role in Brooklyn, nor did it exert authority over
> the NYPD, the City agency alleged now to be responsible for
> strip-searching misdemeanor arrestees in Brooklyn.   Finally
> ... the claims raised in *Tyson* were focused on a written DOC
> directive that was promulgated just to cover Manhattan and
> Queens, while the current litigation alleges an unwritten
> practice of routinely conducting strip-searches in
> Brooklyn."

Therefore, it is apparent that Magistrate Judge

Pollak's decision that the two matters were not substantially

related was based on an analysis of the congruence between the

material facts at issue in the past and present litigations and

not in any way on the contradicted testimony of Hueston.

Accordingly, as stated above, this decision was not clearly

erroneous.

### Exposure to Confidential & Privileged Information

Defendant also argues that Magistrate Judge Pollak's

finding that Hueston was not exposed to privileged and

confidential information concerning *Tyson* was clearly erroneous

because it was based in part upon Hueston's contradicted

testimony.   Such reliance, defendant maintains, thwarts the

purpose of the disqualification rule, which is to preserve the

public trust in the administration of justice and the integrity
of the bar by safeguarding the confidences and secrets of
clients.

In *United States v. Raddatz*, 447 U.S. 667, 676 (1980),
the Supreme Court held that in reviewing objections to the report
and recommendation of a magistrate judge concerning the
credibility of witnesses, a court need not undertake a *de novo*
review of such testimony but may, instead, afford a degree of
deference to the credibility determination of the magistrate.
The Second Circuit has similarly held that district judge
reviewing the credibility determinations of a magistrate may
defer to the judgment of the magistrate because of the
magistrate's superior ability as the primary factfinder to
observe witnesses and their demeanor. *See United States v.
Taylor*, 92 F.3d 1313, 1327 (2d Cir. 1996); *United States v.
Griffiths*, 845 F. Supp. 105, 107 (W.D.N.Y. 1994). Other circuits
have held that a magistrate's credibility determinations are
entitled to substantial deference and should rarely be modified
or set aside. *See United States. v. Ramirez-Chilel*, 289 F.3d
744, 749 (11th Cir. 2002) (holding that magistrate's findings
concerning credibility should only be set aside if it appears
that the judge's understanding of the facts is "unbelievable");
*United States v. Breeland*, 53 F.3d 100, 103 (5th Cir. 1995)
(finding that clear error review is "especially rigorous" when
applied to the credibility determinations because the magistrate
has seen and judged the witnesses firsthand and thus those

determinations are entitled to "due deference"); *United States v. McDowell*, 21 F.3d  429, 429 (6th Cir. 1994) (holding that "great deference" is to be accorded to the credibility determinations of magistrates).  Nevertheless, a district court may choose to reject the findings of the magistrate and conduct an evidentiary hearing in order to determine the credibility of the witnesses if it is left with a definite and firm conviction that the credibility determinations of the magistrate are inaccurate.  *See Raddatz*, 447 U.S. at 676; *Taylor*, 92 F.3d at 1327; *see also Hill v. Beyer*, 62 F.3d 474, 481 (3d Cir. 1995) ("[a] district court may either accept the recommendation of a magistrate judge or reject the recommendation and reach an independent conclusion after hearing testimony and viewing witnesses").

Here, Magistrate Judge Pollak placed Hueston under oath and observed his demeanor throughout two days of testimony.[10] Because Hueston denied receiving any privileged or confidential information and because defendant offered no conclusive evidence linking Hueston to such information, Magistrate Judge Pollak decided to credit Hueston's testimony in its entirety.  In this situation, where Hueston's credibility has been tested and Magistrate Judge Pollak considered all of defendant's "newly discovered" evidence, deference to the findings of the magistrate is proper.  This Court is not left with the definite and firm

---

[10]    Despite defendant's contrary arguments, it is clear from Magistrate Judge Pollak's order that she based her decision on her observation of defendant at the September 6th and 20th hearings and not on his previous statements.  (*See* Pollak Op. at 17.)

conviction that the original factfinder has committed an error.
*See Raddatz*, 447 U.S. at 676; *Taylor*, 92 F.3d at 1327; *Griffiths*,
845 F. Supp. at 107  Moreover, deference here is also appropriate
in light of the legislative purpose of § 636(b)(1) and Rule
72(a), which was to alleviate the increasing congestion of
litigation in the district courts.  *See Raddatz*, 447 U.S. at 676
n.3 (reasoning that liberally revisiting credibility determina-
tions of the magistrate judge would defeat the legislative
purpose of § 636(b)(1)).

### Conclusive Proof of Exposure

Finally, defendant argues that Magistrate Judge
Pollak's ruling is contrary to law because it would require
defendant to produce "conclusive proof" that Hueston received
privileged and confidential information concerning the Manhattan
and Queens litigations while he was employed by the SFLD.
Defendant maintains that a party moving for disqualification on
successive representation grounds need not show that counsel
actually obtained privileged and confidential information;
rather, the moving party need only show that the attorney would
have had access to the relevant information by virtue of his
involvement in the prior case.

Here again, defendant's argument ignores the
conjunctive relationship of the applicable three-prong
disqualification test that has been noted both by this Court and
by Magistrate Judge Pollak in both her May 20th and January 28th
Orders.  It is well established in the Second Circuit that "the

substantial relationship test does not exist for its own sake.
Rather it serves as a substitute for proof that it is generally
improper for a Court to entertain." *U.S. Football League*, 605 F.
Supp. at 1461 (citing *inter alia Cheng*, 631 F.2d at 1056; *Emle*,
478 F.2d at 571; *T.C. Theatre*, 113 F. Supp. at 268, 269)).  Thus,
where the movant has established a substantial relationship
between the past and present litigation, the Court must presume
that confidences and privileged information were disclosed during
the prior representation.  *See Peacock Holdings, Inc. v. Mass.
Mut. Life Ins. Co.*, 1996 WL 285435, at *8 (E.D.N.Y. 1996) (citing
*Allegaert v. Perot*, 565 F.2d 246, 250 (2d Cir. 1977); *T.C.
Theatre Corp.*, 113 F. Supp. at 268).  Having failed to establish
a substantial relationship between the past and present
litigation, defendant was not entitled to a presumption that
Hueston had access to privileged and confidential information.
*See id.*

     In this Circuit it is well settled that the presumption
of access to privileged information that arises after the movant
has established that the existence of a substantial relationship
is rebuttable.  *See Cheng*, 631 F.2d at 1056; *Silver Chrysler
Plymouth, Inc. v. Chrysler Motors Corp.*, 518 F.2d 751, 754 (2d
Cir. 1975); *Laskey Bros. of W. Va., Inc. v. Warner Bros.
Pictures*, 224 F.2d 824, 827 (2d Cir. 1955); *Huntington v. Great
Western Resources, Inc.*, 655 F. Supp. 565, 572 (S.D.N.Y. 1987);
*U.S. Football League*, 605 F. Supp. at 1462 n.28; *Int'l Union
(UAW)*, 466 F. Supp. at 571; *see also Gov't of India*, 569 F.2d at

741 (Mansfield, J. concurring). The Second Circuit has
recognized the incongruity of making a presumption rebuttable and
then making the standard of proof for rebuttal unattainably high
and has held that an attorney may rebut the presumption through
testimony and/or affidavits. *See Silver Chrysler-Plymouth*, 518
F.2d. at 751; *Laskey*, 224 F.2d at 827. If a court credits the
testimony or affidavits of counsel, the presumption is rebutted,
and the court may deny the motion for disqualification or examine
other supporting evidence offered by the movant. *See id.*;
*Huntington*, 655 F. Supp. at 572; *see also Gov't of India*, 569
F.2d at 741 (Mansfield, J. concurring).

        In this case Magistrate Judge Pollak credited Hueston's
testimony after thoroughly examining defendant's "newly
discovered" evidence and allowing defendant to cross-examine
Hueston. Not only did she properly grant Hueston an opportunity
to rebut defendant's claims, she also allowed defendant to
challenge this rebuttal. Because Magistrate Judge Pollak applied
the appropriate legal standard in determining whether Hueston
actually or was likely to have had access to privileged and
confidential information and because this Court is not left with
a definite and firm conviction that a mistake has been made, it
cannot be said that Magistrate Judge Pollak's decision was
clearly erroneous or contrary to law. Accordingly, defendant's
motion on this ground is denied.

- 25 -

## CONCLUSION

For the reasons set forth above, the decision of Magistrate Judge Pollak is affirmed.

The Clerk is directed to furnish a filed copy of the within to all parties and to the magistrate judge.

SO ORDERED.

Dated :   Brooklyn, New York
August 22 , 2003

_____
United States District Judge